IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CHATHA M. TATUM,

                    Petitioner,

          v.                              CASE NO. 19-3228-JWL-JPO

TOMMY WILLIAMS,

                    Respondent.


<u>MEMORANDUM AND ORDER</u>

This matter is a petition for habeas corpus filed under 28 U.S.C. § 2254. Petitioner challenges his convictions of first-degree murder and attempted first-degree murder. He seeks relief from his convictions on the grounds that he was denied the effective assistance of counsel and that other claims were improperly found barred by state procedural rules. The court has considered the record and the filings of the parties, including petitioner's motion to supplement the traverse. For the following reasons, the court denies relief.

### Procedural and Factual Background

**Procedural background**

In July 2004, petitioner was convicted in the District Court of Wyandotte County, Kansas, of one count of first-degree murder and one count of attempted first-degree murder. Petitioner was tried with a co-defendant before a jury. He was sentenced to a term of life without the possibility of parole for 50 years. On June 9, 2006, the Kansas Supreme Court (KSC) affirmed the convictions and sentence. *State v. Tatum*, 135 P.3d 1088 (Kan. 2006).

On June 11, 2007, petitioner filed a motion under K.S.A. 60-1507. In January 2013, the state district court denied relief. The Kansas Court of Appeals (KCOA) affirmed the decision. *Tatum v. State*, 353 P.3d 470 (Table), 2015 WL 4486775 (Kan. Ct. App. Jul. 17, 2015), *rev. denied*, Feb. 18, 2016.

On May 11, 2016, petitioner filed a second motion under K.S.A. 60-1507. The district court summarily denied relief, and the KCOA affirmed that decision. *Tatum v. State*, 423 P.3d 1065 (Table), 2018 WL 4039222 (Kan. Ct. App. Aug. 24, 2018), *rev. denied*, Sep. 27, 2019.

**Factual background**

The facts of the incident, investigation, and trial were summarized by the KSC as follows:

> *Overview*
> On December 17, 2003, Damon Walls, his girlfriend Kyea Kimbrough, and his friend Terrell Williams drove to Dwayne Coates' house in Kansas City, Kansas, to purchase marijuana. The buy had been prearranged shortly before. When they arrived at Coates' house, Walls parked the car and Williams got out. As Williams walked up to the house, Walls' car was hit by a barrage of gunfire. Walls and Kimbrough both received multiple gunshot wounds. Walls survived but Kimbrough died.
>
> *The investigation*
> That evening, Kansas City, Kansas, police officers were investigating a crime scene in the 1700 block of Cleveland when they heard about 20 to 30 gunshots in the next block. At first they ducked for cover, not knowing if the shots were directed at them. They then ran between the houses and saw a van speeding away. Shortly after that, they received a call that there was shooting in the 1500 block of Haskell.
>
> When officers arrived at the scene, they found a large number of shell casings in the street in front of 1532 Haskell, along with a large amount of blood on the curb, a shoe, a Ruger 9 mm handgun, a cell phone, and broken glass. Crime scene technicians recovered 21 spent shell casings

of different calibers—.223 caliber, .40 caliber, and .45 caliber.

As additional officers were being dispatched to the scene, another call came in that two shooting victims from the Haskell crime scene were at the fire station about 12 blocks away. At the fire station, officers found a vehicle parked in the driveway. The car had been riddled with bullets and had shattered windows and a flat front tire. Walls was lying on the ground outside the driver's side of the car, and Kimbrough was lying outside the passenger side of the car. Both were being attended to by several firemen or paramedics. Walls had suffered three nonfatal gunshot wounds to his left side and one to his right foot. Kimbrough suffered six gunshot wounds and died.

At the fire station, Walls identified the shooters as "Edie" and "Charlie" and said they were driving a gray Chevy minivan. The investigation led the police to suspect that "Edie" was Chatha Tatum. The next day, when Walls was shown a photographic lineup that included Tatum's photograph, he immediately identified Tatum as one of the shooters.

Walls told a detective that he thought "Charlie" was Charlie Allen, that he had a brother named Terry Allen, and that his nickname was "Nose." When Walls was shown a lineup containing a photograph of an individual named Charlie Allen, Walls was adamant that the Charlie who was involved in the shooting was not in that lineup. The detective contacted the Kansas City, Missouri, Police Department's intelligence unit and learned that a man named Charles Winston associated with Tatum and had a brother named Terry Allen. When Walls was shown a photographic lineup containing Winston's picture, he identified him immediately.

Williams was questioned the night of the shooting, but he initially lied about his presence at the scene, telling the police he was just an innocent bystander. However, the next day he admitted he went to Coates' house with Walls and Kimbrough and saw the shooting. He told officers he saw a man he knew as Edie shooting at Walls' car.

Walls' and Williams' versions of the events that night differed somewhat, so they are set out separately below.

*Damon Walls' testimony*

When they arrived at Coates' house, Walls noticed a
dark-colored minivan parked across the street and another
car in front of the van. Walls noticed from the exhaust that
the vehicles were running. Williams got out of the car, Fat
Mac (involved in arranging the marijuana purchase) got out
of the car parked in front of them, and they walked up toward
the house. Walls then received a call on his cell phone from
Williams, who said, "[H]ey, Bro, that's the dudes from the
mall." That remark referred to an incident at Oak Park Mall
earlier that summer where Winston and Tatum had threatened
Walls. That incident will be discussed in detail below.

Walls then saw Winston get out of the van and saw Tatum get
out of one of the cars parked nearby. He knew Tatum and
Winston from the incident at Oak Park Mall, and he had played
basketball with Winston at the local community center when
he was younger. He saw that Winston had a gun, and Winston
pointed it at Walls' car in a gesture that appeared to be
intended to let Tatum know that Walls was in that car. Walls
tried to slide down into the seat, and then the shooting
started. He saw Winston shooting from the front of the van
and saw Tatum shooting from the side of the van.

Kimbrough was in the passenger seat, and Walls leaned over
and tried to push her out of the car, but she had her seat
belt on. He climbed out of the car through the passenger
side window, and as he did, he was shot in the foot. The
shooting stopped about that time. He opened the passenger
door as he lay on the ground and then undid Kimbrough's
seatbelt. He heard the van drive off fast. Williams came
over to the car, helped Walls get into the back seat, and
drove him and Kimbrough to the fire station.

At trial, Walls identified Winston and Tatum as the
shooters.

*Terrell Williams' testimony*
When they arrived at Coates' house, Williams saw a maroon
van parked across the street. There were three to four
people in the van. As he walked up to the house, he heard
someone in the van asking "[I]s that him, is that him?" He
tried to call Walls on his cell phone to ask him if they
were the guys from the mall, but he said he did not get hold
of Walls.

He then saw Tatum get out of the van, and the shooting
started. He dove onto the porch and lay there. He looked
through the porch rails and saw two people shooting.

However, the only one he saw get out of the van was Tatum. He recognized Tatum from the incident at Oak Park Mall. After the shooting stopped, he jumped off of the porch and began to run when he heard Walls yelling for him. He went over to the car, helped Walls into the car, and drove them to the fire station.

At trial Williams identified Tatum as the shooter he saw that night.

*The Oak Park Mall incident*
During the summer before the shooting, Walls, Williams, and Marcus Harris were at Oak Park Mall. Williams saw a group of three guys staring at them. Walls recognized two of the three as Tatum and Winston. A few minutes later, the group approached them and Tatum told Walls he looked like someone Tatum had "popped." Williams recalled that Tatum said, "We killed a nigga looked just like you, we gonna get you too." After Tatum's comment, Winston told Walls that Walls' little brother was going to have to get Walls' name tattooed on his neck next. Walls knew the comment concerned his older brother "Messy Marvin," who had been shot and killed 2 years earlier. Walls had had his brother's name tattooed on his neck after Marvin was killed. Harris took the comment to mean that they wanted Walls dead just like his brother.

Williams then asked what was going on, and Tatum said they had a problem with Walls, they did not like him, and that Walls knew what was going on. Williams asked Tatum and Winston who they were, and Tatum said he, indicating Walls, knew who they were.

Tatum did not actually display a gun that day; however, they all believed that he had one. Williams testified that during the confrontation, Tatum "stressed" that he had a gun. Tatum said, "I'm ready, we can do whatever" and indicated to them he had a gun by the way he had placed his hand and from the "gun print" he saw in Tatum's pocket. Harris saw Tatum tap on a bulge on his hip that looked like a gun.

Although the incident was serious, and he was scared, Walls just "laughed it off" because he did not have a gun with him. After they left the mall, Walls called his grandmother and told her about the incident. He was very upset.

At trial, Walls, Williams, and Harris each identified Winston and Tatum as the men at the mall.

*Gang evidence*
The State's theory of the case was that the shooting was
gang related in that it arose out of an ongoing conflict
between two rival Kansas City, Missouri, gangs. Victim
Walls was from Kansas City, Missouri, as were the
defendants.

The State filed a motion prior to trial to introduce
evidence of gang membership to provide the motive for the
shooting and to explain the Oak Park Mall incident. Tatum's
counsel filed a motion in limine seeking to exclude evidence
of his association with the Hilltop gang unless the State
could show that any such association was directly related
to the crimes charged. He also sought to exclude any
evidence concerning the murder of Walls' brother and any
evidence that Marvin Walls' murder provided the motive for
the shooting in this case.

There was a pretrial hearing at which the State presented
testimony from Kansas City, Missouri, Homicide Detective
Everett Babcock to support its request to allow gang
evidence. The transcript of that hearing was part of the
record in Winston's case but was not included in the record
in this case.

The court ruled that the gang evidence would be admissible
as the State had established that it was relevant to show
a motive for what would otherwise be an inexplicable act.

At trial, the State presented the following gang evidence
through Walls, Walls' grandmother, George Anna Myers, and
Detective Babcock.

Walls believed the reason Tatum and Winston tried
to kill him that night was because of the gang-related
murder of his brother almost 2 years earlier. Walls' brother
Marvin had been a member of the Kansas City, Missouri, gang
called Tre Wall, also known as Third Wall and Tre Tre. Marvin
had a Tre Wall tattoo. Tre Wall was in a longstanding feud
with a rival Kansas City, Missouri, gang called Hilltop.

Walls testified that Tatum and Winston "claimed" Hilltop.
He knew Tatum was a Hilltop member from things he had
overheard from his brother. Walls testified that although
he personally did not have any problem with Hilltop, his
brother's conflict with Hilltop became his problem too,
because that is the way things work with the Kansas City
gangs. If gang members have a problem with someone, they

also have a problem with that person's little brother. While Walls denied that he was involved in a gang, he admitted that he has friends who are Tre Wall members.

Myers testified that Marvin became involved in a "beef" over some tennis shoes with Terrence Diamond and his associate, defendant Tatum. Diamond was a member of the 51st Street gang, and Tatum was with Hilltop. According to what Walls had told police, Diamond and Tatum were very close friends. Eventually, the conflict escalated, and Marvin shot at Diamond and other Hilltop gang members. Marvin had told Myers he had to shoot at them because the situation had come to the point where they were going to kill him. Both Walls and Myers believe Marvin was killed by Diamond. Additionally, Myers testified that Coates was supplying marijuana to gang members from Hilltop.

Detective Babcock testified about his knowledge of Kansas City, Missouri, gangs and the longstanding violent conflict between the Hilltop and Tre Wall gangs. He testified that Hilltop covers an area of town homes that extends from 17th Street to 23rd Street along Topping in Kansas City, Missouri. He testified that Hilltop is affiliated with other gangs, such as the 51st Street gang. Tre Wall covers the area from Linwood south to about 39th Street and includes the 3000(Tre) blocks in between.

Detective Babcock testified that indicators that someone is associated with a gang include claiming membership, having gang-related tattoos, and wearing gang colors. He testified that Hilltop members are likely to identify themselves with tattoos of their block, such as 23rd Street. Because Hilltop is considered a Crips set, they often wear blue. Tre Wall is considered a Bloods set, and they often wear red.

Detective Babcock testified that he first heard of "Edie" about 3 years ago, and the name was associated with Hilltop. Since then, he had determined that "Edie" was Chatha Tatum, the defendant. He testified that Tatum is affiliated with Hilltop and that Tatum has a tattoo depicting a street sign with the numbers "Duce" and "Tre" indicating his affiliation with Hilltop.

Detective Babcock testified that Winston is also associated with Hilltop. He testified that Tatum and Winston associated together and were friends, and that Tatum was also friends with Winston's brother, Terry Allen, who is

a Hilltop member. He also testified that Walls' brother, Marvin, was a Tre Wall member and had been involved in a conflict with Terrence Diamond, a member of 51st Street, which is affiliated with Hilltop.

Detective Babcock also testified that gang-related homicides are typically an ambush-style attack with multiple rounds, and the witnesses in those cases tend to be uncooperative.

The defense called no witnesses. The jury found Tatum guilty of one count of first-degree murder and one count of attempted first-degree murder. Tatum received a hard 50 life sentence on the first-degree murder conviction and a concurrent sentence of 195 months on the attempted murder conviction. His appeal follows.

*State v. Tatum,* 135 P.3d 1088, 1091-93 (Kan. 2006).

## Standard of review

This matter is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA). Under the AEDPA, when a state court has adjudicated the merits of a claim, a federal court may grant habeas relief only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2). In this context, an "unreasonable application of" federal law "must be objectively unreasonable, not merely wrong." *White v. Woodall*, 572 U.S. 415, 419 (2014) (quotations omitted).

The court presumes the correctness of the fact-finding by the

state court unless petitioner rebuts that presumption "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). *See also Wood v. Allen*, 558 U.S. 290, 301 (2010) ("a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance").

These standards are intended to be "difficult to meet," *Harrington v. Richter*, 562 U.S. 86, 102 (2011), and they require that state court decisions receive the "benefit of the doubt." *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002).

A habeas petitioner generally must exhaust available state court remedies before seeking federal habeas relief. "A threshold question that must be addressed in every habeas case is that of exhaustion." *Harris v. Champion*, 15 F.3d 1538, 1554 (10th Cir. 1994). "The exhaustion requirement is satisfied if the federal issue has been properly presented to the highest state court, either by direct review of the conviction or in a postconviction attack." *Dever v. Kansas State Penitentiary*, 36 F.3d 1531, 1534 (10th Cir. 1994).

The presentation of a claim "requires that the petitioner raise in state court the 'substance' of his federal claims." *Williams v. Trammell*, 782 F.3d 1184, 1210 (10th Cir. 2015). A federal court can excuse exhaustion "only if there is no opportunity to obtain redress in state court or if the corrective process is so clearly deficient as to render futile any effort to obtain relief." *Duckworth v. Serrano*, 454 U.S. 1, 3 (1981).

The procedural default doctrine provides an additional limit to review in habeas corpus cases. A federal habeas court may not review "federal claims that were procedurally defaulted in state court – that is, claims that the state court denied based on an adequate and independent state procedural rule" – unless the prisoner demonstrates either cause for the procedural default and resulting prejudice or that the failure of the federal court to review the claim will result in a fundamental miscarriage of justice. *Davila v. Davis*, 137 S.Ct. 2058, 2064-65 (2017); *Coleman v. Thompson*, 501 U.S. 722, 750 (1991).

Likewise, where a petitioner fails to present a claim in the state courts and would now be procedurally barred from presenting it if he returned to state court, there is an anticipatory procedural bar which prevents the federal court from addressing the claim. *Anderson v. Sirmons*, 476 F.3d 1131, 1139 n.7 (10th Cir. 2007). As in the case of other procedurally defaulted claims, a petitioner's unexhausted claims barred by anticipatory procedural default cannot be considered in habeas corpus unless he establishes cause and prejudice for his default of state court remedies or a fundamental miscarriage of justice. *Gray v. Netherland*, 518 U.S. 152, 162 (1996).

To demonstrate cause for a procedural default, a petitioner must show that some objective factor external to the defense impeded his ability to comply with the state's procedural rule. *See Murray v. Carrier*, 477 U.S. 478, 488 (1986). "Objective factors that constitute cause include interference by officials that makes

compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to [petitioner.]" *McCleskey v. Zant*, 499 U.S. 467, 493-94 (1991) (internal quotation marks omitted). A petitioner also must show "actual prejudice as a result of the alleged violation of federal law." *Coleman*, 501 U.S. at 750.

A procedural default also may be excused if a petitioner can show that the failure to consider the defaulted claim would result in a fundamental miscarriage of justice. To proceed under this exception, a petitioner "must make a colorable showing of factual innocence." *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000). A petitioner seeking relief under a defaulted claim and asserting a claim of innocence must show that "in light of new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *House v. Bell*, 547 U.S. 518, 536-37 (2006)(quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)).

## Discussion

*1. Claims of prosecutorial misconduct and ineffective assistance of counsel*

Petitioner first seeks habeas corpus relief on related claims of prosecutorial misconduct and ineffective assistance of counsel. Petitioner's claim is complex. He first asserts that prosecutorial misconduct occurred when the prosecutor intimidated a potential defense witness, Antonio Ford. Mr. Ford then asserted his rights under the Fifth Amendment and did not testify. Petitioner next claims that

both trial and appellate counsel provided ineffective assistance by failing to raise this claim, which, he argues, excuses any procedural default of the claim of prosecutorial misconduct. Finally, he claims that trial counsel provided ineffective assistance by failing to use Mr. Ford's exculpatory statement at trial.

Petitioner presented his claim of prosecutorial misconduct in his second motion under K.S.A. 60-1507, claiming the State improperly intimidated Mr. Ford into invoking his rights under the Fifth Amendment[1]. He claimed that the State's interference with Mr. Ford's testimony was based upon a false claim that Mr. Ford had been charged with felony murder. And petitioner claimed that the State had failed to disclose exculpatory evidence, specifically, that Mr. Ford said he did not see petitioner at the crime scene. *Tatum v. State*, 2018 WL 4039222, at *5.

The KCOA rejected the claim of prosecutorial misconduct. First, it found that the claim was one of trial error which should have been presented on appeal. Because petitioner presented the claim in an action under K.S.A. 60-1507, the KCOA found that it was procedurally barred. The KCOA cited Kansas Supreme Court Rule 183(c)(3), which

---

[1] The trial record shows that Mr. Ford was subpoenaed to appear at petitioner's trial. Mr. Ford had been charged in a separate action with crimes arising from the same incident for which petitioner was on trial. Mr. Ford had made a first appearance, but he did not have counsel at the time of petitioner's trial. Accordingly, the trial court appointed an attorney to advise Mr. Ford on his rights concerning whether he would testify in petitioner's trial. After consulting with the prosecutor, that counsel, Gary Stone, advised Mr. Ford to invoke the Fifth Amendment. Mr. Ford did so, and the trial court released him from the subpoena. Mr. Stone's statements to the district court refer to the fact that Mr. Ford was charged with felony murder. Trial Trans., Vol. II, pp. 308-312. There is no showing here that the prosecutor somehow intimidated Mr. Ford, and, to the extent petitioner's claim may be read to attack the decision of the prosecutor to charge Mr. Ford in the same incident, he does not state a claim for habeas corpus relief. Charging decisions lie in the discretion of prosecuting officials, and a decision concerning what charges are supported involves the application of state law.

provides:

> "A proceeding under K.S.A. 60-1507 ordinarily may not be used as a substitute for direct appeal involving mere trial errors or as a substitute for a second appeal. Mere trial errors must be corrected by direct appeal, but trial errors affecting constitutional rights may be raised even though the error could have been raised on appeal, provided exceptional circumstances excuse the failure to appeal."

Kansas Supreme Court Rule 183(c)(3).

The KCOA found that petitioner made no argument that showed exceptional circumstances to establish cause for the failure to present the issue on direct appeal. *Tatum v. State*, 2018 WL 4039222, at *5. The KCOA also cited petitioner's failure to provide evidentiary support for the claim of prosecutorial misconduct, found that petitioner's trial counsel was aware of the exculpatory statement of Mr. Ford, and found that the State charged Mr. Ford with first-degree murder on June 10, 2004, prior to petitioner's trial. Mr. Ford entered guilty pleas to other charges in September 2004, well after petitioner's trial. *Tatum*, 2018 WL 4039222, at *5-6.

Petitioner's claim concerning prosecutorial misconduct, a trial error, is procedurally barred by his failure to present it in his direct appeal as required by Kansas case law and by Kansas Supreme Court Rule 183(c)(3).

"It is well established that federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S.

722, 729 (1991)). A state procedural rule "is independent if it is separate and distinct from federal law," and "is adequate if it is 'strictly or regularly followed' and applied 'evenhandedly to all similar claims.'" *Duvall v. Reynolds*, 139 F.3d 768, 796-97 (10th Cir. 1998) (quoting *Hathorn v. Lovorn*, 457 U.S. 255, 263 (1982)). "The doctrine applies to bar federal habeas [relief] when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement." *Coleman*, 501 U.S. at 729-30; *see also Banks v. Workman*, 692 F.3d 1133, 1144 (10th Cir. 2012) ("When a state court dismisses a federal claim on the basis of noncompliance with adequate and independent state procedural rules, federal courts ordinarily consider such claims procedurally barred and refuse to consider them.").

Accordingly, even assuming petitioner can assert a federal claim involving the intimidation of a witness on the facts in this action, the claim of prosecutorial misconduct is procedurally barred and may not be considered in this habeas action unless petitioner can overcome the default by showing cause and prejudice arising from the alleged violation of federal law or can show that the failure to consider the claim will result in a fundamental miscarriage of justice. *Coleman*, 501 U.S. at 750.

Petitioner asserts his trial and appellate attorneys provided ineffective assistance by failing to argue prosecutorial misconduct.

Claims alleging ineffective assistance of counsel are analyzed under the standard established in *Strickland v. Washington,* 466 U.S. 668 (1984). Under *Strickland*, "a defendant must show both that his counsel's performance fell below an objective standard of reasonableness and that

the deficient performance prejudiced the defense." *United States v. Holloway*, 939 F.3d 1088, 1102 (10th Cir. 2019) (internal quotation marks omitted). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

The review of claims of ineffective assistance of counsel presented in habeas corpus is deferential to the state courts. *See Harmon v. Sharp*, 936 F.3d 1044, 1058 (10th Cir. 2019). "When assessing a state prisoner's ineffective-assistance-of-counsel claims on habeas review, [federal courts] defer to the state court's determination that counsel's performance was not deficient and, further, to the attorney's decision in how to best represent a client." *Id.* (internal quotation marks and brackets omitted).

"[I]n certain circumstances counsel's ineffectiveness in failing properly to preserve [a] claim for review in state court will suffice" as "'cause' to excuse a procedural default." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). However, in that scenario, a claim of ineffective assistance "generally must 'be presented to the state courts as an independent claim before it may be used to establish cause for a procedural default'" of another constitutional claim. *Carpenter*, 529 U.S. at 451-52 (quoting *Murray v. Carrier*, 477 U.S. 478, 489 (1986)).

Because petitioner did not present this claim as an independent claim of ineffective assistance, he cannot assert it as grounds to establish cause for the procedural default of his claim of prosecutorial misconduct.

Likewise, petitioner cannot establish that a miscarriage of

justice will occur if his claim is not considered. As stated, to show a miscarriage of justice, petitioner must show that the error asserted probably resulted in the conviction of an innocent person. In this context, a petitioner must show factual innocence. *Beavers v. Saffle*, 216 F.3d 918, 923 (10th Cir. 2000). Petitioner has not made this showing.

Finally, petitioner claims that his trial counsel was ineffective for failing to present the exculpatory statement made by Mr. Ford. Respondent correctly observes that petitioner does not clearly identify the exculpatory statement in this action; however, the court construes the argument to refer to the claim in petitioner's second action under 60-1507 that Mr. Ford had stated that he did not see petitioner at the crime scene.

This claim of ineffective assistance fails. As petitioner recognizes, Mr. Ford, the declarant, had invoked the Fifth Amendment and did not testify. Petitioner's counsel therefore could not present his out-of-court statement.

In sum, petitioner's claim of prosecutorial misconduct is procedurally barred by his failure to present it on appeal. His assertion of ineffective assistance as cause for the failure to properly present the claim of prosecutorial misconduct fails because it was never asserted as a separate claim of ineffective assistance. And his claim of ineffective assistance based on the failure to introduce Antonio Ford's exculpatory statement at trial fails because Mr. Ford's invocation of the Fifth Amendment prevented his counsel from introducing that out-of-court statement.

*2. The rejection of petitioner's pro se submission in the state courts*

Petitioner next alleges that the Kansas appellate courts erred in rejecting a pro se submission due to his failure to comply with state procedural rules.

Petitioner provides little information about this assertion but claims his submission was rejected by the KCOA and the Kansas Supreme Court "for his failure to cite the Vol and Pg number in the brief for his appeal." (Doc. 1, p. 25.)

This claim essentially challenges the application of a state procedural rule by the state appellate courts. A federal court reviewing a petition for habeas corpus relief is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991). And a state court's interpretation of its own law "'binds a federal court sitting in habeas corpus.'" *Williams v. Trammell*, 782 F.3d 1184, 1195 (10th Cir. 2015) (quoting *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005)). Petitioner is not entitled to relief on this claim.

*3. Counsel's failure to call alibi witnesses*

Petitioner next claims his trial counsel provided ineffective assistance by failing to call alibi witnesses.

As explained under Ground 1, a petitioner presenting a claim of ineffective assistance of counsel must show both that counsel's representation was deficient and that the deficient performance resulted in prejudice. *Strickland,* 466 U.S. at 688, 692. The court presumes that the challenged performance was "within the wide range of reasonable professional assistance", *id*. at 689, and takes "a 'highly deferential' look at counsel's performance through the 'deferential lens of § 2254(d).'" *Cullen v. Pinholster*, 563 U.S. 170,

190 (2011)(internal citations omitted).

In his first action under K.S.A. 60-1507, petitioner argued that his trial counsel was ineffective because she failed to call alibi witnesses at trial. The trial court held an evidentiary hearing, and both petitioner and his mother testified that they informed counsel of three alibi witnesses, namely, Melissa Shaw, Alexis Young, and Sue Hollowin. Counsel testified that she met Ms. Young on a jail visit to petitioner, and that petitioner advised counsel that he might use Ms. Young as an alibi. Ms. Young confirmed this, and counsel took her phone number. Counsel then advised petitioner that if he intended to present an alibi, she needed to know the details of that defense. Counsel testified that she remembered talking to Ms. Young but her case file did not contain notes from their conversation and that she believed that Ms. Young did not have information that would aid petitioner's defense. Counsel also testified that her case file did not contain any mention of Ms. Hollowin, and she did not receive her name as a potential alibi witness. Counsel received a letter from a "B. Shaw" stating that she knew petitioner did not commit the crime, but it did not state that she could provide an alibi. Counsel testified that she did not meet with anyone named Melissa Shaw.

Counsel testified that in preparing for trial, she asked petitioner to prepare a journal describing the State's allegations from his perspective. When she received the journal, it did not suggest that petitioner had an alibi for the time of the crimes. She testified that she met with petitioner and his mother on several occasions and that information she developed did not suggest an alibi defense would be appropriate. Finally, she testified that on one occasion,

petitioner asked her to investigate a defense of intoxication and that at a hearing on one of the pretrial motions, petitioner advised her that he had no witnesses for trial.

Petitioner's mother also testified at the hearing and stated that she took Melissa Shaw to counsel's office. She did not personally go into the office with Ms. Shaw and did not think that Ms. Shaw met with counsel.

Petitioner testified at the hearing and claimed he directed counsel to present an alibi witness on his behalf and gave her the names of Ms. Shaw, Ms. Young, and Ms. Hollowin. He stated that when the prosecution rested, counsel asked him about his alibi witness and told him she would try to locate his witness.

None of the witnesses identified by petitioner appeared or testified at the evidentiary hearing.

The state district court rejected the claim of ineffective assistance concerning an alibi defense. The KCOA affirmed that finding, explaining that it would not reweigh the evidence or credibility determinations made by the district court. It found that petitioner had failed to establish prejudice concerning the failure to pursue an alibi defense, noting that none of the women identified as alibi witnesses testified at the 60-1507 hearing, that petitioner himself provided no details concerning what their testimony would have been, and that he testified only that he had been with Ms. Shaw and Ms. Young on the day of the shootings and that they were not in Wyandotte County. *Tatum v. State*, 353 P.3d 470, 2015 WL 4486775, at *10-13 (Kan. Ct. App. 2015).

As explained, a habeas court will presume that counsel's conduct

is within the range of reasonable professional assistance. It is generally settled that "trial counsel's informed decision not to call a particular witness is a tactical decision and thus a matter of discretion for counsel." *Newmiller v. Raemisch*, 877 F.3d 1178, 1198 (10th Cir. 2017).

Here, the facts found by the district court and the KCOA show that petitioner did not provide counsel with a detailed explanation of an alibi defense that would be supported by witnesses. The journal prepared by petitioner did not elaborate on his alibi, counsel's trial file did not reflect any specific information provided to her, and no evidence concerning the alibi witnesses was developed during the post-conviction proceedings.

While petitioner argues that counsel should have done additional investigation, "[as] is always the case, trial counsel could have done more. But the question under *Strickland* is not whether counsel could have done more, but whether counsel's decision not to do more was '[objectively unreasonable] in all the circumstances, applying a heavy measure of deference to counsel's judgments.'" *Turrentine v. Mullin*, 390 F.3d 1181, 1209 (10th Cir. 2004) (quoting *Strickland).*

Here, the state courts applied the appropriate standard of review, and petitioner did not present information to support an alibi defense. The court has considered the record and, under the deferential standards of review that apply under *Strickland* and § 2254(d), agrees that petitioner is not entitled to relief on this claim.

*4. The failure to investigate Damon Walls' telephone conversation*

Petitioner claims his trial counsel provided ineffective

assistance by failing to investigate a telephone conversation between the surviving shooting victim, Damon Walls, and his father.[2]

The KCOA addressed this claim in petitioner's appeal in his second action under K.S.A. 60-1507, stating:

> Tatum argues McBratney was ineffective for failing to investigate or call Damon Walls or Walls' father to testify at trial. Tatum claims that this testimony would have implicated another person as the shooter and would have supported his theory that he was not at the scene of the crime.
>
> Notably, Tatum raised this exact issue in his first 1507 motion. At the evidentiary hearing on that motion, [petitioner's 60-1507 counsel] questioned McBratney about her failure to have Walls or Walls' father testify at trial. Tatum also testified extensively about why this testimony would have helped his case. After considering all of the testimony and other circumstances, the district court ruled that McBratney's representation did not fall below an objective standard of reasonableness and even if her performance had been deficient, Tatum was not prejudiced because the outcome of the proceeding would not have been different. Although Tatum did not challenge this part of the district court's ruling in the appeal of his first 1507 motion, we affirmed the district court's decision to deny Tatum's motion. *See Tatum*, 2015 WL 4486775 at *7-13.

*Tatum v. State*, 2018 WL 4039222, at *3.

The record thus shows that petitioner presented this claim in

---

[2] During the evidentiary hearing held in petitioner's first action under K.S.A. 60-1507, petitioner's former trial counsel testified that she listened to 105 or more minutes of recorded telephone conversations between Mr. Walls and his father, Damon Thomas. Mr. Thomas was incarcerated at the time of the conversations, and the conversations were recorded by the correctional facility. Petitioner's counsel testified that she had reviewed most of the conversations with petitioner but did not believe they had listened together to all of them. She described Mr. Thomas's statements as advising "his son Damon Walls that he should hunt down the people who shot them and kill them back, and et cetera, et cetera. But when Damon Walls had told his dad that he had told the police, his dad, like, said, well, we can go with plan B, tell the police the truth." Counsel testified that the calls also discussed the Oak Park Mall confrontation, which she described as "my client and the defendant in this case pulled a weapon on Damon Walls on a previous incident." Counsel testified that she concluded that the recorded conversations contained nothing that would benefit petitioner at trial. Transcript of evidentiary hearing, Case No. 07-cv-984, pp. 49-51.

his first motion under K.S.A. 60-1507. After an evidentiary hearing, the district court denied relief, and petitioner did not challenge that particular ruling in his appeal. He raised the claim again in his second motion under K.S.A. 60-1507, but the district court summarily dismissed the action, finding that petitioner's claims were conclusory and not supported by the record, that he failed to allege exceptional circumstances that would justify consideration of a successive application, and that he failed to establish that manifest injustice would result if the district court failed to reach the merits. *Tatum*, 2018 WL 4039222, at *2.

The KCOA found that the district court did not err in declining to reach the merits of petitioner's claims in the second action under 60-1507. It affirmed the dismissal, citing K.S.A. 60-1507(c), which states, "(c) *Successive motions*. The sentencing court shall not be required to entertain a second or successive motion for similar relief on behalf of the same prisoner." The KCOA also cited *State v. Trotter,* in which the Kansas Supreme Court explained, "A [movant] in a 60-1507 motion is presumed to have listed all grounds for relief and a subsequent motion need not be considered in the absence of [a showing of] circumstances justifying the original failure to list a ground." *State v. Trotter*, 295 P.3d 1039, 1044 (Kan. 2013)(citation omitted). *Tatum v. State*, 2018 WL 4039222, at *3.

The court finds that the dismissal of this claim on independent and adequate state law grounds bars review in federal habeas corpus, and that petitioner has shown no grounds to excuse the default or to establish manifest injustice. *Coleman*, 501 U.S. at 729-30 (1991); *see also Bunton v. Atherton*, 613 F.3d 973, 989 (10th Cir. 2010)("Federal

habeas courts are prohibited from reviewing a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment."(brackets and quotations omitted)).

### Petitioner's motion for clarification

Finally, the court addresses petitioner's motion for clarification. Petitioner seeks an explanation of the ruling of September 19, 2022, in which the Honorable Sam A. Crow of this court denied his renewed motion for access to the trial record and stated, in part, that a traverse is not the appropriate vehicle to present new issues. (Doc. 65, p. 2).

This matter was transferred to the undersigned on October 7, 2022. The court has examined the order and concludes that the reference is addressed to the denial of petitioner's request for access to the full trial record. It is well-established that "[c]ourts routinely refuse to consider arguments first raised in a habeas traverse." *Martinez v. Kansas*, No. 5-3415-MLB, 2006 WL 3350653, *2 (D. Kan. Nov. 17, 2006) (unpublished order) (collecting cases); *See also LaPointe v. Schmidt*, No. 14-3161-JWB, 2019 WL 5622421, *5 (D. Kan. Oct. 31, 2019) (unpublished memorandum and order) (striking new claim from traverse). Therefore, petitioner's request for access to the full record may have been understood as a request to support an attempt to identify additional issues or to present new argument at a point in the development of this action where new issues should not be introduced.

The court agrees with the denial of access to the trial record

and finds no ground to modify the order.

## Conclusion

For the reasons set forth, the court concludes petitioner is not entitled to relief in habeas corpus.

Under Rule 11 of the Rules Governing Section 2254 Cases in the United States District Courts, "the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." *See* 28 U.S.C. § 2253(c)(1)(A).

To obtain a certificate of appealability, a petitioner must make "a substantial showing of the denial of a constitutional right." *Id.* § 2253(c)(2). For claims denied on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000). For claims denied on procedural grounds, he must show "that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* ... whether the district court was correct in its procedural ruling." *Id.*

The court finds no grounds to grant a certificate of appealability in this matter.

IT IS, THEREFORE, BY THE COURT ORDERED the petition for habeas corpus is dismissed.

IT IS FURTHER ORDERED no certificate of appealability will issue.

IT IS FURTHER ORDERED petitioner's motion to supplement the traverse (Doc. 73) is granted.

IT IS FURTHER ORDERED petitioner's motion for clarification (Doc. 74) is granted.

**IT IS SO ORDERED.**

DATED:  This 31st day of October, 2022, at Kansas City, Kansas.


S/ John W. Lungstrum

JOHN W. LUNGSTRUM
UNITED STATES DISTRICT JUDGE